J-S65045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: N.A.B., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Y.B., MOTHER | No. 1032 EDA 2014 |

Appeal from the Decree January 28, 2014
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: CP-51-0000659-2010;
CP-51-AP-0000119-2012;
FID: 51-FN-001136-2011

BEFORE: PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.: **FILED FEBRUARY 05, 2015**

Y.B. ("Mother") appeals from the decree entered on January 28, 2014, in the Philadelphia County Court of Common Pleas, involuntarily terminating her parental rights to her minor child, N.A.B. ("Child"), born in August of 2008. We affirm.[1]

The relevant facts and procedural history of this case are as follows. On April 19, 2010, the City of Philadelphia Department of Human Services'

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] At the January 28, 2014 termination hearing, A.S. ("Father") indicated his willingness to sign petitions for voluntary relinquishment and to confirm consent. (**See** N.T. Hearing, 1/28/14, at 4-5). Thereafter, Father signed both petitions and, on May 27, 2014, the trial court entered a decree terminating Father's parental rights to Child pursuant to the petition to confirm consent.

Children and Youth Division ("DHS") received a General Protective Services ("GPS") report alleging that Mother had tested positive for marijuana and benzodiazepines during the birth of Child's sibling. (*See* N.T. Hearing, 1/28/14, at 66-67). At the time, Child resided with Mother and a paternal relative. During DHS' investigation of the GPS report, Mother disclosed that she was recently released from incarceration and had a mental health history of depression and Bipolar Disorder. (*See id.* at 67). DHS' investigation substantiated the GPS report and the case was opened for services. (*See id.* at 68). From May 11, 2010 to August 10, 2010, DHS implemented In-Home Protective Services through the Juvenile Justice Center. (*See id.* at 67-68).

On May 26, 2010, Mother entered an inpatient dual diagnosis drug and alcohol program at Interim House West ("Interim House"). (*See id.* at 68-69). On June 10, 2010, Mother tested positive for marijuana. (*See id.* at 69). On August 13, 2010, Mother left Interim House with Child without permission. (*See id.*). Mother and Child's whereabouts were unknown until August 31, 2010, when Mother contacted DHS and reported that she and Child were residing with a family friend, Ms. S. (*See* Trial Court Opinion, 6/11/14, at unnumbered page 2). Mother admitted to DHS that she left Interim House to resume her drug use. (*See* N.T. Hearing, 1/28/14, at 69). After visiting Ms. S's home, DHS instituted a Safety Plan by which Child could remain in Mother's care so long as she and Child resided in the home of Ms. S. (*See* Trial Ct. Op., at unnumbered page 2). Additionally, the Safety Plan stipulated that Ms. S would keep Child in her home if Mother

decided to leave or became incarcerated as a result of a pending assault charge. (*See id.*).

On September 22, 2010, DHS filed a dependency petition on Child's behalf due to concerns regarding Mother's drug use, mental health status, and lack of appropriate supervision. (*See* N.T. Hearing, 1/28/14, at 70-71). On October 12, 2010, the trial court held a dependency hearing, at the conclusion of which it adjudicated Child dependent and ordered that Child may remain in Mother's custody under the supervision of DHS, subject to certain conditions. (*See* Trial Ct. Op., at unnumbered page 2). Specifically, the trial court referred Mother to the Clinical Evaluation Unit ("CEU") for a drug screen, dual diagnosis assessment, and monitoring. (*See id.*). Further, the trial court ordered that if Mother did not follow through with the CEU's recommendations, had a positive drug screen, or failed to comply with the DHS Safety Plan, DHS, upon request, would obtain an Order of Protective Custody ("OPC") on Child's behalf. (*See id.*). Subsequently, DHS learned that Mother violated the Safety Plan by placing Child in the care of an unauthorized party, and, in accordance with the trial court's dependency order, DHS requested and obtained an OPC with respect to Child. (*See id.*).

On October 15, 2010, the trial court held a shelter care hearing, at the conclusion of which it lifted the OPC and placed Child in DHS' custody.[2] (*See id.*). On October 27, 2010, a Family Service Plan ("FSP") meeting was held. The FSP objectives identified for Mother were to (1) achieve and

---

[2] Father did not attend the shelter care hearing because he was incarcerated for multiple criminal convictions. (*See* Trial Ct. Op., at unnumbered page 2).

maintain sobriety by participating in a substance abuse evaluation, follow all treatment recommendations and submit to random drug screens; (2) stabilize her mental health; (3) attend parenting education classes; and (4) maintain a relationship with Child.  (***See id.***).

On February 2, 2011, the trial court held a permanency review hearing, at which DHS reported that Mother had been discharged from the substance abuse treatment program due to non-attendance.  The trial court re-referred Mother to the CEU for drug screening and assessment.  Another permanency review hearing was held on May 10, 2011, at which DHS reported to the trial court that Mother was non-compliant with the CEU. Again, the trial court re-referred Mother to the CEU for a drug screen, dual diagnosis assessment, and monitoring.  At the hearing, the trial court also noted that Child had been placed in kinship care with Child's godmother, T.A. ("Godmother").

The next permanency review hearing took place on August 10, 2011, at which the trial court found that Mother was attending treatment at Al-Assist and participating in parenting classes.  The trial court referred Mother to the CEU for monitoring and three random drug screens to take place prior to the next court date.  The trial court also ordered that, if she rendered two consecutive clean drug screens, Mother would be permitted to have unsupervised day visits with Child.  On November 15, 2011, the trial court held another permanency review hearing, at which DHS reported that Mother was non-compliant with the CEU.  DHS also reported that Mother had not visited Child.  Again, the trial court re-referred Mother to the CEU for a drug screen, dual diagnosis assessment, and monitoring.  The trial court also

ordered that Mother's supervised visits with Child at DHS were to be reduced to bi-weekly, but that Mother was permitted to have weekly visits with Child at Godmother's home.

On December 19, 2011, Mother pleaded guilty to the charge of driving under the influence of alcohol or controlled substances, and related charges dating back to a June 24, 2009 arrest. On February 15, 2012, Mother was sentenced to a term of not less than seventy-two hours nor more than six months' incarceration, followed by two years of probation. (**See** DHS Exhibit 1—Criminal Docket). As conditions of her probation, Mother was required to participate in intensive outpatient drug and alcohol treatment and to submit to random drug screens. (**See** N.T. Hearing, 1/28/14, at 12). In February 2012, Mother entered a drug and alcohol treatment program at Gaudenzia. (**See id.**). On March 16, 2012, DHS filed petitions for the involuntary termination of Mother and Father's parental rights to Child, alleging the elements of 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) as grounds for termination, and for changing Child's permanency placement goal from reunification to adoption. Over the course of her probationary drug screening from June to July 2012, Mother tested positive for marijuana and benzodiazine on multiple occasions and, as a result, spent a month incarcerated. (**See id.** at 14). Upon her release, Mother was ordered to complete drug treatment at Gaudenzia and, subsequently, re-entered the program. (**See id.**).

On November 19, 2012, a second dependency hearing took place, at which the trial court found that Mother was receiving dual diagnosis treatment at Gaudenzia and was in full compliance with the permanency

- 5 -

plan. While noting that Child had been in placement for two years (since October 15, 2010), the trial court determined that reunification remained a viable goal for Child, and, thus, did not proceed to a hearing on DHS' outstanding termination/goal change petitions. In January 2013, Mother completed the Gaudenzia program and Child was returned to her care. (*See id.* at 15, 41, 64). A permanency review hearing was held on April 2, 2013, at which the trial court found that Mother had obtained appropriate housing and had completed anger management and parenting classes and the Gaudenzia dual diagnosis program. At the subsequent permanency review hearing on June 25, 2013, the trial court ordered Mother to continue to comply with mental health services and then listed the matter with a view to discharge at the next permanency review hearing scheduled for September 10, 2013.

In August 2013, Mother tested positive for marijuana and benzodiazepines at the birth of Child's sibling. (*See* N.T. Hearing, 1/28/14, at 15-16). Thereafter, DHS obtained an OPC for Child. A shelter care hearing was held on August 22, 2013, at the conclusion of which the trial court, finding that returning Child to Mother's care was not in Child's best interest, placed Child in DHS' custody and referred Mother to the CEU for a drug screen and dual diagnosis assessment. On January 7, 2014, DHS filed an amended petition for the involuntary termination of Mother and Father's parental rights to Child, alleging the elements of 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) as grounds for termination, and for changing Child's permanency placement goal from reunification to adoption.

On January 28, 2014, the trial court held a termination hearing. At the hearing, DHS presented the testimony of Mother's probation officer, Michael Johnson, DHS social worker, Valerie Walker, DHS Director of Ongoing Services, Helen Hansberry, and Lutheran Children and Family Services of Eastern Pennsylvania ("LCFS") social worker, Aisha Robinson. Mother was present at the hearing but chose not to testify or present any evidence on her behalf. At the conclusion of the hearing, the trial court entered the underlying order, involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b), and permitting adoption of Child to continue without further notice to, or consent of, Mother. On February 26, 2014, Mother simultaneously filed a timely notice of appeal and a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother raises a single question for our review:

Did the [trial court] err in terminating Mother's parental rights where [Child] was never abused or neglected, there is a strong positive bond between Mother and [Child], and [Child] would be harmed by the termination?

(Mother's Brief, at 3).

We review appeals from the involuntary termination of parental rights according to the following standard:

. . . [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result

- 7 -

merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

. . . [T]here are clear reasons for applying an abuse of discretion standard of review in these cases. . . . [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2511, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 8 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511) (case citations omitted).  The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid.  *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).  Moreover, we have explained: "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  *Id.* (citation and internal quotation marks omitted).  "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence."  *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Here, the trial court terminated Mother's parental rights pursuant to section 2511(a)(2)[3] and (b), which provide, in relevant part, as follows:

### § 2511. Grounds for involuntary termination

---

[3] We are cognizant that the court also found a legal basis for terminating Mother's rights pursuant to section 2511(a)(1), (5), and (8). (*See* Decree of Involuntary Termination of Parental Rights, 1/28/14, at 1-2).  However, Mother's question on appeal focuses on the language in section (a)(2), (*see* Mother's Brief, at 3), and this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004) (stating that "[w]hile the trial court found that . . . CYS met its burden of proof under each section [2511(a)(1), (2), (5) and (8)] we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights.") (citations omitted).

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

Our Supreme Court set forth the relevant inquiry under section 2511(a)(2) as follows:

[Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that [t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

- 10 -

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, *supra* at 827 (citations and quotation marks omitted).

Further, this Court has long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citation omitted). "[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.* (citation omitted).

In her brief on appeal, Mother challenges the trial court's weighing of the evidence under section 2511(a). Mother contends that the trial court, in weighing the evidence before it, relied too heavily on the fact of Mother testing positive for drugs at the birth of Child's sibling in August 2013 and accorded little weight to Mother consistently testing negative for drugs from August 2012 through July 2013. (*See* Mother's Brief at 6-8). Mother also avers that she re-entered treatment immediately after testing positive in August 2013. (*See id.* at 8). As such, Mother argues that, given this lengthy period of sobriety in conjunction with her continual efforts and commitment to seek treatment, the trial court, in concluding that the circumstances warranted termination of parental rights under section 2511(a)(2), accorded improper weight to what Mother characterizes as "a

- 11 -

momentary relapse during an extended period of improvement," and, thereby, committed an abuse of discretion. (*Id.* at 8). We disagree.

Mother's argument is, in effect, an attempt to have this Court re-weigh the evidence presented and revisit the credibility determinations of the trial court. However, it is well established that "[t]he trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony." *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006) (citation omitted). Further, if competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *See In re Adoption of S.P.*, *supra* at 827. Here, we are satisfied that the trial court's findings are supported by clear and convincing, competent, and sufficient evidence in the record. Accordingly, Mother's argument provides no grounds for relief.

Moreover, our review of the record belies Mother's attempt to characterize her most recent positive drug test as the product of "a momentary relapse during an extended period of improvement." (Mother's Brief at 8). On the contrary, the record evidences a recurring pattern of Mother receiving treatment for her issues with substance abuse only to suffer a relapse, which has endured for almost four years notwithstanding both criminal court and dependency court oversight and DHS' repeated provision of rehabilitative services and assistance. The record establishes that Mother was referred to the CEU for dual diagnosis treatment on five separate occasions but was unable to achieve any lasting success towards sobriety. Indeed, even the possibility of incarceration resulting from a

violation of the terms of her probation and the risk to the health of her unborn child proved incapable of dissuading Mother from abusing drugs prior to the birth of Child's sibling in August 2013. Under these circumstances, we are convinced that Mother's chronic inability to achieve and maintain sobriety has caused Child to be without essential parental care, control, or subsistence, and that the trial court reasonably concluded that Mother is incapable of curing her substance abuse problems, thus warranting termination of her parental rights under section 2511(a)(2). Accordingly, we discern no abuse of discretion or error of law in the trial court's decision to terminate Mother's parental rights to Child pursuant to section 2511(a)(2).

We now turn our attention to section 2511(b) to determine if the trial court properly found that termination was in the best interest of Child. This Court recently explained the requisite analysis under section 2511(b) as follows:

> Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of a child. The trial court also must discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. The extent of the bond-effect analysis necessarily depends upon the unique facts and circumstances of the particular case.
>
> We observe that [the trial] court is not required by statute or precedent to order a formal bonding evaluation by an expert. Indeed, in assessing the parental bond, the [trial] court is permitted to rely upon the observations and evaluations of social workers. Moreover, the mere existence of an emotional bond does not preclude the termination of parental rights. . . .
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should consider the intangibles, such as the love, comfort, security, and stability the child

might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012) (citations omitted).

Here, Mother argues that the trial court, in finding that termination of her parental rights would best serve the needs and welfare of Child pursuant to section 2511(b), failed to give adequate consideration to testimony of the strong positive bond that exists between Mother and Child. (*See* Mother's Brief, at 9-10). In support of her claim, Mother references the testimony of DHS social worker, Ms. Walker, who "stated that there is clearly affection between Mother and [Child] and that they are strongly bonded to each other." (*Id.* at 9). Mother also cites the testimony of LCFS social worker, Ms. Robinson, who "characterized the interaction between Mother and [Child] as a **positive** attachment" and "further testified that [Child] loves Mother, enjoys visiting with her, and that Mother provides [Child] with love and educational support." (*Id.* at 9-10) (emphasis in original). As such, Mother contends that the evidence establishes the existence of a strong positive bond between her and Child, the severing of which will detrimentally impact Child, and, thus, that the trial court erred in its analysis under section 2511(b). (*See id.* at 11-13).

In its Rule 1925(a) opinion, with respect to section 2511(b), the trial court noted its findings as follows: "In the instant matter, the testimony established that [Child] would not suffer any irreparable emotional harm if [Mother's] parental rights were terminated. [Child] has bonded with [Godmother during foster care placement]. Additionally, the testimony described the relationship between [Child] and [Godmother] as strong and

loving." (Trial Ct. Op. at 5-6 (record citations omitted)). Our review of the record indicates that there is clear and convincing, competent, and sufficient evidence to support the trial court's findings. Although there is evidence to support Mother's claim that she and Child share a bond, the existence of a parent-child bond in no way serves to preclude the termination of parental rights. *See In re K.M.*, *supra* at 791. Rather, the existence of a parent-child bond is only one of a number of factors that the trial court must consider in conducting a needs and welfare analysis under section 2511(b). Indeed, because the trial court must consider the totality of the circumstances in determining a child's best interest, "[t]he question becomes whether the bond between [child] and [parent] is one worth saving or whether it could be sacrificed without irreparable harm to [the child]." *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008).

At the termination hearing in the instant case, DHS social worker, Ms. Walker, DHS Director of Ongoing Services, Ms. Hansberry, and LCFS social worker, Ms. Robinson, each testified to her professional opinion that Mother's parental rights should be terminated, notwithstanding the bond between Mother and Child. (*See* N.T. Hearing, 1/28/14, at 38, 51, 55-56, 79, 84-85). Moreover, both Ms. Walker and Ms. Hansberry testified that Child would not be irreparably harmed by severance of the bond between Mother and Child, and that it was in Child's best interest to be free for adoption. (*See id.* at 38-39, 49-50, 79, 81-82). Ms. Hansberry also testified that Child has done well in adjusting to different caregivers, stating, "I think [Child] has a connection to [Mother] but that [Child] has learned that there are other caretakers who will provide the parenting for [Child],

given the inconsistency and the disruptions that [Child] has had so far." (*Id.* at 82). In fact, the testimony and evidence established that Child shares an equally compelling parent-child bond with Godmother, who has presented herself as a possible adoption resource for Child, and with whom Child lived from early 2011 to January 2013 after being placed in kinship care. (*See id.* at 52-53, 79). Further, despite Mother's willingness to perform her role as Child's parent, the fact of her ongoing inability to achieve lasting sobriety is a cause for uncertainty about whether Mother is even capable of providing Child with a stable environment in which to live.

Therefore, we determine that it was appropriate for the trial court to find that termination of Mother's parental rights would not cause irreparable harm to Child and would be in Child's best interest. In consideration of these circumstances and our careful review of the record, we conclude that the trial court did not abuse its discretion or commit an error of law in finding competent evidence to support the termination of Mother's parental rights to Child under section 2511(b).

Accordingly, for the reasons stated above, we affirm the trial court's decree involuntarily terminating Mother's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/2015

- 16 -